A94A0204. STRICKER et al. v. EPSTEIN et al.
A94A0205. EPSTEIN v. STRICKER et al.
A94A0206. FEINBERG v. STRICKER et al.
(444 SE2d 91)

POPE, Chief Judge.

In 1984, defendants Alan Epstein and Kenneth Feinberg established defendant Macon Gas Resources Corporation ("MGRC") and became its officers, directors and shareholders. MGRC and Orlando Capital Resources ("Orlando") then formed Macon Gas Resources General Partnership ("the partnership"), a partnership created for the purpose of recovering methane gas from a Macon landfill, processing it and selling it as an energy source. The methane gas recovery system in Macon became operational and successful, and the partnership's revenues were split evenly between MGRC and Orlando on a monthly basis. In the meantime, Epstein and Feinberg also established other, separate corporations to engage in similar projects at landfills in Atlanta (Atlanta Gas Resources Corporation or "AGRC") and Birmingham (Birmingham Gas Resources Corporation or "BGRC"). The projects in these cities were not as successful, and there is evidence that in 1987 Epstein and Feinberg decided they needed to raise additional capital for them. However, instead of asking people to invest in AGRC or BGRC, they invited various family members to buy stock in the successful Macon corporation. The monies raised by this sale of stock in MGRC were then used for AGRC and BGRC.

Epstein contacted his cousin, Leila Stricker, and she and her husband ("plaintiffs") agreed to purchase 140 shares of stock in MGRC for $35,000. In January 1988, at the same time as the purchase of the stock, plaintiffs and Epstein and Feinberg executed two stockholder agreements. Pursuant to these agreements, plaintiffs were to be paid seven percent of MGRC's gross revenues on a monthly basis or a minimum of $7,000 per year, plus a special distribution of $35,000 in 1989. In return, plaintiffs gave Epstein and Feinberg their voting

rights and a right of first refusal with respect to their stock.

Plaintiffs received several monthly checks pursuant to the agreement, but the checks soon stopped. The partnership ceased operations at the Macon landfill in 1989, when the gas recovery equipment was destroyed and never rebuilt or replaced. Nonetheless, MGRC had income of $250,000 in 1990. In 1986, the partnership had sold some of its unused rights to gas at the Macon landfill to Cherokee Brick & Tile Company ("Cherokee"). In addition to the amount paid to the partnership at the time of the sale, Cherokee agreed that it would pay the partnership an additional $500,000 in March 1990 if specified levels of productivity were achieved. This contingency occurred, and the $500,000 payment to the partnership became due. In the meantime, however, Epstein and Feinberg had borrowed $200,000 from Cherokee for use on the Birmingham project; and Epstein arranged for the $250,000 owed to MGRC (one-half of the $500,000 owed to the partnership) under the Cherokee agreement to be used to pay off that obligation.

Plaintiffs sued Epstein, Feinberg and MGRC for breach of contract, an accounting, fraud, violation of securities laws and breach of fiduciary duty. After discovery, the parties filed cross-motions for partial summary judgment. With respect to the breach of contract claim, both plaintiffs' and defendants' motions were denied. However, defendants' motions for summary judgment were granted on the fraud, violation of securities laws and breach of fiduciary duty counts. In Case No. A94A0204, plaintiffs appeal the grant of summary judgment to defendants as to fraud, violation of securities laws and breach of fiduciary duty, as well as the denial of their own motion for summary judgment on the breach of contract count. In Case Nos. A94A0205 and A94A0206, Epstein and Feinberg appeal the denial of their motions for summary judgment on the breach of contract claim.

## Case No. A94A0204

1. Plaintiffs first argue that the trial court erred in ruling that the merger clause in the stockholder agreement, which provides that no representations other than those contained in that document were made, precludes their fraud action. We agree that the trial court erred. A plaintiff who is fraudulently induced to enter into a contract cannot sue for breach of that contract and for damages for fraud if the contract in question contains a merger clause, because the plaintiff cannot simultaneously affirm a contract which states that no representations were made and allege fraud based on such representations. See *Carpenter v. Curtis*, 196 Ga. App. 234 (395 SE2d 653) (1990). But see 196 Ga. App. at 238-239 (Deen, P. J., concurring specially) (two of the three judges on the panel in *Carpenter* joined in a

special concurrence criticizing this rule as unfair because it may leave the defrauded plaintiff without an adequate remedy). In this case, however, the fraud plaintiffs allege is the fraud which induced their actual purchase of stock in MGRC, while the document containing the merger clause — which is also the agreement upon which their breach of contract action is based — reflects an agreement between stockholders in which plaintiffs sold voting rights and rights of first refusal in return for certain payments. Accordingly, the contract plaintiffs "affirm" by suing for breach is not the agreement allegedly induced by fraud, so the rule of *Carpenter* does not apply.

Defendants contend the purchase of stock was actually part of the stockholder agreement because it happened at the same time as the stockholder agreement and would not have occurred without it since the payments provided for in that agreement were really returns on plaintiffs' investment rather than payments for voting and first refusal rights. However, the language of the stockholder agreement clearly contemplates that all parties are already stockholders; and the merger clause, which states that "[t]his instrument represents the entire understanding between the parties," itself belies defendants' argument that the purchase of stock was an implicit part of the same transaction. Thus, the purchase of the stock and the agreement between the stockholders were two separate transactions, regardless of the fact that the purchase was made in contemplation of execution of the stockholder agreement; and the merger clause in the latter does not preclude a fraud action based on the former.

Evidence in this case, viewed in a light favorable to plaintiffs, shows that Epstein and Feinberg agreed to sell stock in one corporation but use the invested money for the benefit of other corporations they owned. There is additional evidence that Epstein expressly represented to plaintiffs that the invested money would be used for improvements to the Macon project, knowing that it would in fact be used for the benefit of the Atlanta and Birmingham projects which were owned and operated by other corporations. However, we hold that even without this express misrepresentation, evidence of an agreement to sell stock in one corporation and use the money for other corporations is alone sufficient to establish fraud and conspiracy to commit fraud on the part of both parties to the agreement.

Feinberg argues he could not have defrauded plaintiffs because he never met or talked with them prior to their purchase of stock. While it appears that Feinberg is less culpable than Epstein,[1] the fact

---

[1] Feinberg told his father, who bought stock in MGRC at about the same time as plaintiffs, that the invested money would be used for the other corporations. Part of the funds Feinberg's father invested was used to pay the Birmingham project's power bill and other accumulated bills of BGRC and AGRC.

remains that, according to his own testimony, Feinberg was party to an agreement to sell stock in MGRC and use the money for the benefit of other corporations. If proved, such an agreement would be fraudulent per se, and Feinberg's participation in it would be sufficient to support a finding that he was party to a conspiracy to defraud despite his lack of direct contact with plaintiffs. See *Grainger v. Jackson*, 122 Ga. App. 123 (1 & 2) (176 SE2d 279) (1970); *Quinn v. Forsyth*, 116 Ga. App. 611 (1) (158 SE2d 686) (1967).

Defendants assert that summary judgment on the fraud claim was nonetheless proper because plaintiffs' action was brought more than two years after the alleged fraud. However, this is a common law fraud claim governed by a four-year statute of limitation, see OCGA § 9-3-31, and the limitation period is not reduced from the four-year period applicable to fraud claims to the two-year period applicable for claims based on violation of securities laws simply because the alleged fraud involves the sale of stock. See *Quinn*, 116 Ga. App. at 619 (4).

2. Plaintiffs contend that summary judgment for defendants on their claim that defendants violated various securities laws was also error. In Georgia, all claims alleging violations of securities laws are governed by a two-year statute of limitation. See *Friedlander v. Troutman, Sanders &c.*, 788 F2d 1500 (11th Cir. 1986); OCGA § 10-5-14 (d). As plaintiffs purchased their stock in January 1988 and filed this action in June 1991, their suit was brought more than two years after the alleged violations occurred. Plaintiffs contend, however, that the fraudulent acts on which this claim is based — the sale of stock in one corporation to raise money for the use of other corporations — tolled the running of the limitation period until the fraud was discovered, which was less than two years before they brought the suit. See OCGA § 9-3-96. "Where actual fraud is the gravamen of an action, 'the statute of limitations is tolled until the fraud is discovered or by reasonable diligence should have been discovered.' [Cit.]" *Hartley v. Gago*, 202 Ga. App. 770, 771 (1) (415 SE2d 510) (1992); see also *Shipman v. Horizon Corp.*, 245 Ga. 808 (267 SE2d 244) (1980). Assuming that actual fraud is the gravamen of this cause of action based on violations of securities laws, we nonetheless conclude that plaintiffs cannot rely on the tolling provisions of OCGA § 9-3-96 because if they had exercised reasonable diligence they would have discovered the fraud more than two years before they filed their claim. Plaintiffs stopped receiving their monthly checks in September 1988 and should have realized that something was wrong at that time. As stockholders, they had the right to look at the corporation's books to see how their investment was used, see OCGA § 14-2-1602, but they did not attempt to do so. Compare *Quinn*, 116 Ga. App. at 618-619 (3). Moreover, though a fiduciary relationship among the parties arose subsequently, no relationship of trust which would excuse plaintiffs' failure

to exercise due diligence existed at the time the actual fraud occurred. Thus, summary judgment for defendants was properly granted on plaintiffs' cause of action based on violations of securities laws. See also *Brooks v. Freeport Kaolin Co.*, 253 Ga. 678 (1) (324 SE2d 170) (1985).

3. The trial court also granted summary judgment to defendants on plaintiffs' breach of fiduciary duty claim. In this cause of action, plaintiffs point to instances subsequent to their purchase of stock in which Epstein and Feinberg used MGRC funds to support their other activities, including Epstein and Feinberg's misuse of the proceeds of the Cherokee sale to pay off their personal obligations to Cherokee. The trial court reasoned that this claim was against Epstein and Feinberg on behalf of the corporation and all its other shareholders, and thus could only be brought as a derivative action. We agree with the trial court. See *Thomas v. Dickson*, 250 Ga. 772 (301 SE2d 49) (1983); OCGA § 14-2-740 et seq.

Plaintiffs argue that Epstein and Feinberg owed them fiduciary duties not only as officers, directors and majority shareholders, but also as the holders of plaintiffs' voting rights pursuant to the stockholder agreements. We agree that if plaintiffs had simply assigned their voting rights to Epstein and Feinberg through a proxy or voting trust arrangement, Epstein and Feinberg would have become plaintiffs' agents and would have owed them special fiduciary duties apart from those owed by officers, directors or majority stockholders to other stockholders. Cf. *Tigner v. Shearson-Lehman Hutton, Inc.*, 201 Ga. App. 713 (411 SE2d 800) (1991) (agent owes fiduciary duties to principal). Here, however, plaintiffs completely and unconditionally sold their voting rights in return for money.[2] Under these circumstances, we conclude the parties they sold these rights to, Epstein and Feinberg, did not owe them any special duties based on that sale, and the trial court did not err in granting summary judgment for defendants on this claim.

4. Lastly, plaintiffs argue that the trial court should have granted summary judgment to them on their breach of contract claim. Pursuant to the stockholder agreements, Epstein and Feinberg agreed that plaintiffs were to be paid seven percent of MGRC's gross revenues on a monthly basis or a minimum of $7,000 per year, plus a special distribution of $35,000 in 1989; and in return, plaintiffs gave Epstein and Feinberg their voting rights and a right of first refusal with respect to their stock. As it is undisputed that plaintiffs performed their part of

---

[2] Plaintiffs in this case, "in consideration of the payments to [them] detailed herein, [agree] that the voting rights incident to [their] ownership of Macon common stock shall be transferred to and exercised jointly by Epstein and Feinberg."

the agreement but have not received most of the promised payments,[3] it would seem that Epstein and Feinberg's liability for breach of the agreement is clear. Epstein and Feinberg contend that the obligation belongs to MGRC and they are not personally liable. By definition, however, a stockholders' agreement is between stockholders and cannot bind the corporation. Epstein and Feinberg signed the agreements as individuals, without indicating that they were representing the corporation in any way. Moreover, the trade of payments for voting and first refusal rights which was the subject of the agreement was clearly between plaintiffs and Epstein and Feinberg rather than plaintiffs and the corporation; and, as we discussed in Division 1, Epstein and Feinberg's contention that the payments were really in return for plaintiffs' investment in the corporation is belied by the merger clause in the stockholders' agreements. The circumstances that the amount of the payments was to be measured by the corporation's gross annual revenues, that the payments plaintiffs did receive came from the corporation, and even that the parties contemplated that all the payments would come from the corporation do not change the fact that payments to plaintiff are clearly promised in an agreement between plaintiffs and Epstein and Feinberg as individuals. See *Attkisson v. Cavanagh*, 201 Ga. App. 633 (411 SE2d 786) (1991) (where individual signs note without indicating that he signs in a representative capacity, he cannot rely on parol evidence to show he is not individually liable); *Upshaw v. Southern Wholesale Flooring Co.*, 197 Ga. App. 511 (3) (398 SE2d 749) (1990) (where context and face of document show individual signed in individual rather than representative capacity, individual liability is clear and parol evidence to contrary is neither admissible nor probative). The agreements in this case are unambiguous, and the trial court erred in failing to grant summary judgment to plaintiffs with respect to Epstein and Feinberg's liability for breach of the stockholders' agreements.

### Case Nos. A94A0205 & A94A0206

5. In these cross-appeals, Epstein and Feinberg argue that the trial court erred in denying their motions for summary judgment on plaintiffs' breach of contract claim. In light of our conclusion in Division 4 that summary judgment should have been granted for plaintiffs on this claim, the trial court's denial of summary judgment to Epstein and Feinberg is affirmed.

*Judgment affirmed in part and reversed in part in Case No.*

---

[3] Actually, plaintiffs did receive several monthly checks in 1988 and one check in 1989. The total of these checks should be considered in determining what defendants owe plaintiffs on this claim, of course.

A94A0204. *Judgments affirmed in Case Nos. A94A0205 and A94A0206. McMurray, P. J., and Smith, J., concur.*

DECIDED APRIL 11, 1994 —
RECONSIDERATION DENIED MAY 13, 1994 — 

*Davis, Zipperman, Kirschenbaum & Lotito, Barry L. Zipperman, Steven A. Suna,* for Stricker.
*Howard A. Becker,* for Epstein.
*Jeffrey N. Berman,* for Feinberg.