**GE LIFE AND ANNUITY ASSURANCE COMPANY,**
Plaintiff

v.

**Bobby DONALDSON and Mildred Donaldson, Defendants/Counterclaim Plaintiffs**

No. 5:01–CV–6702(WDO).

United States District Court,
M.D. Georgia,
Macon Division.

March 5, 2002.

Robert C. Norman, Jr., Howard Jerome Strickland, Macon, GA, Charles C. Platt, Randall M. Fox, LeBoeuf, Lamb, Green & MacRae, LLP, New York City, John W. Woods, Jr., Washington, DC, for Plaintiffs.

Gary C. Christy, Cordele, GA, Stanley L. Merritt, Jr., Jason Lance Crawford, Columbus, OH, Hardy Gregory, Jr., Preyesh K. Maniklal, Cordele, OH, Gary O. Bruce, Columbus, OH, Kice H. Stone, Macon, GA, Jonathan H. Waller, Birmingham, AL, for Defendants.

### ORDER

OWENS, District Judge.

This case filed pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, is before the Court on the following motions:

1. Defendants' Motion to Dismiss/Motion for Summary Judgment [Tab 7 and 40];

2. Plaintiff's Motion for Summary Judgment on Defendants' Counterclaims [Tab 34];

3. Plaintiff's Motion to Strike Plaintiff McBride and Counterclaim Plaintiff's Statement [Tab 52]; and

4. Plaintiff's Motion to Strike the Affidavits and Reports of Purported Expert Tim C. Ryles [Tab 54].

Because the Motion to Dismiss has been converted into a Motion for Summary Judgment, it will now be analyzed under Federal Rule of Civil Procedure 56 and applicable case law. Defendants Bobby and Mildred Donaldson requested the Court to incorporate into this case certain portions of the briefs and exhibits filed in the related *McBride* case. *See* Tab 29. For the areas in which those materials are applicable to Defendants Bobby and Mildred Donaldson, they are hereby adopted.

### I. Factual and Procedural History

On February 14 or 18, 1986, GE issued a life insurance policy to Bobby Donaldson. *See* Tab 40 at ¶ 2; Tab 41, ¶ 1. Mr. Donaldson believed at the time he purchased this policy that he was actually increasing his coverage under an existing policy. *See* Tab 44 at ¶ 2. He has since learned that he actually purchased a completely different policy. Defendant contends the selling agent Ralph Smith affirmatively represented to him the policy would remain in force as long as he continued to pay the scheduled premium of $95 per quarter. *Id.* at ¶ 3. Smith also allegedly represented that the premium amount would remain fixed and level throughout the life of the policy. *Id.* The premium increased to $235 per quarter in January 1997. *See* Tab 44 at ¶ 9. Mr. Donaldson contacted Ralph Smith numerous times over a period of several months in 1997 about this dramatic increase and Smith assured him he would

take care of the problem. *Id.* However, the premium continued to rise.

The evidence shows that GE marketed these policies to consumers like Defendant who had existing policies the cash value of which could be used to purchase the new policy. *See* Tab 49. A fee was taken out of the cash value in existing policies and was transferred into the new policy. Defendant contends this fee was never disclosed to him or other consumers. Defendant was told the interest on his new policy would fund the policy in the future. If interest rates fell, the cash value of the policy would diminish but this was not disclosed in the policy. The agent allegedly advertised the policy as an investment or savings instrument which would pay interest to the account from which insurance premiums would be paid. Defendant contends that the effect a drop in interest rates would have on the policy was never explained to him. He also contends he never received a buyer's manual that more fully explains the policy. *See* B. Donaldson Aff. at ¶ 4. GE is now charging a premium substantially higher than the one originally represented, around $280 per quarter, and it will likely increase with time.

The administration of the policy is best explained by GE's designated corporate representative, Bruce Booker. Booker is the Vice President for Business Development. *See* Depo. of Booker at 11:19–20. Part of Booker's responsibilities includes product design, actuarial projections and pricing projections. *Id.* at 13–16. In his deposition,[1] Booker explained how the company priced the policies. He explained the company made projections on how interest rates were going to affect the cost of the policies and thus the cash value of the policies. *Id.* at 38–59. The cash value is almost entirely dependent on interest rates remaining stable for 20 to 30 years.

The Donaldsons' policy was to remain in force until 2037—51 years. Mr. Booker testified that "I don't believe there is ever any reason or requirement to assume that either current interest rates or credited interest rates would remain at any particular level for 30 years." *Id.* at 81:17–20. In fact, Booker stated, "I believe that the actuarial principles would—would require that the actuary not make assumptions that depend on the interest rate being unchanging over a long period of time." *Id.* at 98:6–9. Although Booker was testifying with McBride's policy as an example, his testimony is applicable in this case because a similar policy is in dispute. McBride's policy had a slightly higher interest rate—9.71%. Booker stated that, in the unlikely event the interest rate remained at or around that rate, McBride's policy would still lapse in year 13 [1999] if he continued to pay only the agreed upon premium of $151. *Id.* at 100:4–21. In fact, Booker clarified the "initial planned premium, periodic premium, would not be sufficient to have the policy last until ... 2028." *Id.* at 100:22–24. Accordingly, "the monthly premium would have to increase to maintain the policy in force." *Id.* at 101:8–11. Likewise, this testimony shows that the Donaldson policy would have lapsed much sooner than 2037 based on the initial interest rate and cash value factors. Notably, from a review of the record, this information is found nowhere in the policy or any accompanying material provided to Donaldson at the time he purchased his policy.

In March of 2000, Mr. Donaldson provided an affidavit in another case alleging he had been defrauded when he purchased the insurance policy. *See* Compl. at Ex. C. In December of 2000, the Donaldsons filed suit in the State Court of Bibb County alleging fraud and violations of Geor-

---

1. Attached as Exhibit 6 to the Collective No- tice of Filing Evidentiary Material at Tab 49.

gia's RICO Act. *Id.* at Ex. D. The Donaldsons voluntarily dismissed that case after it was removed to this Court. Based on the foregoing, Plaintiff filed the instant Declaratory Judgment action and asked the Court to find the contract valid and enforceable as written. Defendants filed a counterclaim alleging violations of Georgia's RICO Act and claims for fraud and deceit based on the confusing and misleading nature of how Donaldson' policy was administered and valued. Defendants contend the policy language as written is not readily understandable and the policy was not administered as the agent represented during the sale of the policy.

## II. Motions to Strike

GE has moved to strike a document filed by McBride and the counterclaim Plaintiff's in this and the other four related cases. The document is entitled "Plaintiff McBride and Counterclaim Plaintiff's Statement." *See* Tab 47. It is essentially a response by Donaldson and the other Counterclaim Plaintiffs to GE's statement of material facts not in dispute filed in support of GE's summary judgment motion. GE contends the Statement is neither contemplated nor required by Rule 56. The Donaldsons contend they filed the Statement only in an abundance of caution to ensure full compliance with Rule 56. Donaldson and the other Counterclaim Plaintiffs have stipulated to withdraw any portion of the Statement not in compliance with the Rules. Further, they indicated they did not anticipate any response from GE to the Statement. The parties have had ample opportunity to address the issues contained in the Statement during the

January 16, 2002 hearing and in the numerous briefs that have been filed. Because all the information contained therein has already been addressed in some form, there is no harm or prejudice in filing the same. More important, the Court has addressed the five related cases collectively for the past year. Therefore, it was not inappropriate for the Donaldsons and the counterclaim Plaintiff's to file a joint statement of material facts. Accordingly, the **Motion to Strike the "Plaintiff McBride and Counterclaim Plaintiff's Statement" is hereby DENIED.**

GE has also moved to strike the Affidavit and Report of Purported Expert Tim C. Ryles.[2] GE contends the purported expert opinions do not satisfy the standards set in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). This Court adopts the reasoning of another judge of this Court that after a full hearing on the matter addressed the admissibility of this same expert's opinion. *See Tidwell v. Allstate Ins. Co.,* No. 1:96–CV–189–1 (M.D.Ga. Apr. 4, 2000)[3]. In *Tidwell,* the court held, "Dr. Ryles has an extensive basis upon which to base his testimony and hence Ryles' testimony regarding the standard of care in the industry … has 'a reliable basis in the knowledge and experience of the relevant discipline.'" *Id.* at *4(citing *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 149, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)). As recognized in *Tidwell,* Ryles' opinion is "based more on his knowledge and experience rather than on scientific matters which were the sub-

**2.** Attached as Exhibits 11 and 12 to Tab 49, the "Collective Notice of Filing Evidentiary Materials and Submission of Exhibits In Opposition to Life of Virginia's Motions for Summary Judgment." The Report is attached to Tab 55 as "Defendant's Disclosure of Expert Testimony."

**3.** Attached as Exhibit A to Defendant's Opposition to Plaintiff's Motion to Strike, Tab 61. The hearing transcript is attached as Exhibit A to Tab 63.

ject of *Daubert.*" *Id.* Therefore, the reports and affidavits of Ryles are admitted.

The opinions are not admitted to decide the ultimate, dispositive issues in this case—the actual legal interpretation of the contracts. Rather, Ryles' expert opinion will be used to explain the complex nature of the contracts and the terms and concepts contained therein. Because that information is relevant to the issues before the Court, appears to be in compliance with Federal Rule of Civil Procedure 702 and GE has been able to respond to the Affidavit, it will not be struck from the record. Accordingly, the **Motions to Strike the Opinions, Affidavits and other filings pertaining to Expert Tim Ryles are DENIED** and GE's request for further oral argument on this issue is DENIED.

## III. Summary Judgment Standard

Summary Judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "Moreover, the moving party has the burden of meeting this exacting standard." *Brooks v. Blue Cross & Blue Shield,* 116 F.3d 1364, 1369 (11th Cir.1997) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). Applying this standard, the Eleventh Circuit explained:

> In assessing whether the movant has met this burden, the courts should view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion. All reasonable doubts about the facts should be resolved in favor of the non-movant. If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial. Summary judgment may be inappropri-

ate even where the parties agree on the basic facts, but disagree about the inferences that should be drawn from these facts. If reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment. Moreover, the party opposing a motion for summary judgment need not respond to it with any affidavits or other evidence unless and until the movant has properly supported the motion with sufficient evidence. The moving party must demonstrate that the facts underlying all the relevant legal questions raised by the pleadings or otherwise are not in dispute, or else summary judgment will be denied notwithstanding that the non-moving party has introduced no evidence whatsoever.

*Id.* (internal citations omitted). In this case, summary judgment is not appropriate if the parties agree on the basic facts—that there was a life insurance policy issued to Bobby Donaldson by GE in 1986—but disagree about the inferences that should be drawn from these facts—whether the contract is fraudulently vague, ambiguous or misleading and whether GE committed fraud when its agent failed to close material information about the contract.

## IV. Statutes of Limitation

### A. Fraud Claims

■ The statute of limitations for fraud claims in Georgia is four years. O.C.G.A. § 9–3–31. Actual fraud tolls the statute of limitations where it is the gravamen of the action before the court. *Shipman v. Horizon Corp.,* 245 Ga. 808, 267 S.E.2d 244, 246 (1980). "Where the basis of an action is actual fraud, the mere silence of the party committing it is treated as a continuation of the original fraud and as constituting a fraudulent concealment, and the statute of limitations does not begin to run against

such right of action until such fraud is discovered, or could have been discovered by the exercise of ordinary care and diligence." *Id.* at 246. *See also Coffee v. General Motors Acceptance Corp.,* 30 F.Supp.2d 1376, 1381 (S.D.Ga.1998)(citing *Shipman*)(actual fraud where defendant intentionally deceives by false representation or by concealment of a fact which has the effect of barring and deterring plaintiff from his action).

▪ The Donaldsons contend there was actual fraud in the procurement of the life insurance policy in question. The statute of limitations would not have begun to run in this case until they discovered the premiums had been fraudulently raised in contradiction to the terms to which they agreed and paid for. Alternatively, the limitations period began to run when they could have reasonably discovered the alleged fraud. The Donaldsons could not have discovered the alleged fraud in this case until some time in 1997 when their premiums were raised. Although the premium was initially raised for the first time in January of 1997, Mrs. Donaldson testified that she contacted Mr. Ralph Smith concerning the matter. He informed her he would handle the matter but they should go ahead and pay the premium. *See* Tab 37, Ex. 7 at 33–44. Several months later in the summer of 1997, Mrs. Donaldson received another letter indicating yet another raise in the premium. Mrs. Donaldson called Ralph Smith again to complain that the 'problem' had not been solved. He again reassured her he would take care of the situation. However, in the Fall of 1997, the Donaldsons received yet another bill showing the increased premium. They paid this premium as billed in November of 1997. It was at this time Mrs. Donaldson called GE herself and someone explained to her that the policy no longer had any cash value and that was the reason the premiums had continued to increase. *See* Tab 43. It was

not until this time that she or Mr. Donaldson could have even suspected the fraud committed by GE years earlier. Because the fraud was not discoverable until approximately November 1997 when the Donaldsons finally learned the premium was raised because of the cash value issue, the statute of limitations would not have run until November of 2001. Since the Counterclaim was filed on July 25, 2001, it was filed within the limitations period.

### B. Georgia RICO Claims

The statute of limitations for Georgia RICO claims is five years. O.C.G.A. § 16–14–8. The Georgia Code provides that "a criminal or civil action or proceeding under this chapter may be commenced up until five years after the conduct in violation of a provision of this chapter terminates or the cause of action accrues." *Id.* Because it is not possible to make this determination at this stage, this issue must be submitted to a jury.

## V. Substantive Claims

### A. Declaratory Judgment Act

▪ GE originally filed its Complaint seeking a declaratory judgment that the policy is the complete agreement between the parties and that nothing in the policy guaranteed the policy would always remain in force or that premiums would never increase. The Declaratory Judgment Act is found at 28 U.S.C. § 2201 *et seq.* There is support in prior precedent that a suit pursuant to this statute is the appropriate method to determine the validity of a contract. *State Farm v. Bates,* 542 F.Supp. 807 (N.D.Ga.1982) (insurance company sought determination of its liabilities under various insurance contracts); *see also Sears, Roebuck & Co. v. American Mut. Liability Ins. Co.,* 372 F.2d 435 (7th Cir. 1967) (the Act affords relief from uncertainty and insecurity with respect to legal

relations); *Hardware Mut. Casualty Co. v. Schantz,* 178 F.2d 779 (5th Cir.1949) (Act's purpose is to prevent suits); *Friedman v. Geller,* 925 F.Supp. 611 (E.D.Wis.1996) (threat of suit makes a justiciable controversy). In *Bates,* the court held, "Federal courts long have held that an insurance company seeking determination of its liabilities under an insurance contract could utilize the Declaratory Judgment Act for such a purpose." *Bates,* 542 F.Supp. at 817. To proceed with a Declaratory Judgment Act claim, there must be an actual issue in controversy as opposed to one that is hypothetical or contrived, the case must not be the medium for securing an advisory opinion, the matter must be definite and concrete, the parties' positions must be defined and adversarial and the issues must be susceptible to judicial determination. *Id.* All of these elements are met in the case at bar.

This case involves a life insurance policy on Bobby Donaldson issued in 1986. On March 29, 2000, Mr. Donaldson submitted an affidavit in another case stating he had been defrauded when he purchased his life insurance policy. *See* Compl. at Ex. C. On December 21, 2000, the Donaldsons filed a Complaint in state court alleging fraud and violations of Georgia's RICO Act in connection with the marketing and sale of a GE policy. *Id.* at Ex. D. A couple of weeks after that case was voluntarily dismissed, GE filed the Complaint in this case. Because there are questions of fact regarding the substantive claims in this case as more thoroughly addressed below, there are actual issues in controversy sufficient to proceed in this .Court under the Declaratory Judgment Act. Accordingly, Defendants Bobby and Mildred Donaldson's Motion for Summary Judgment as to this Court's lack of jurisdiction to consider the Declaratory Judgment action is **DENIED.**

**B. Fraud and Concealment Claim**

**1. Prima Facie Case of Fraud**

■ To state a claim for fraudulent misrepresentation under Georgia law a plaintiff must prove five essential elements: (1) that the defendant made representations; (2) that defendant knew the representations were false; (3) that these. representations were made intentionally and for the purpose of deceiving the plaintiff; (4) that plaintiff reasonably relied on these representations; and (5) that as a proximate result of the misrepresentations plaintiff incurred damages. *See* O.C.G.A. § 23–2–52; *Williams v. Dresser Indus., Inc.,* 120 F.3d 1163, 1167 (11th Cir.1997). "Georgia law further provides that 'suppression of a ·material fact which a party is under an obligation to communicate constitutes fraud.'" *Id.* (citations omitted).

■ "The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case." *Id.* "An obligation to disclose must exist before a party may be held liable for fraud based upon the concealment of material facts." *Id.* "In cases where Georgia courts have found the existence of a confidential relationship in business, the parties have had either a history of business dealings with each other or the kind of relationship that is not armslength, such as a partnership or principal and agent." *Id.* at 1168. "However, Georgia courts have recognized that even though the parties were acquainted as friends or business associates prior to a business transaction, a confidential relationship .is not automatically established." *Id.* The "existence of a confidential relationship depends upon the circumstances and therefore is generally a jury issue." *Id.* "Where one person sustains towards another a relation of trust and confidence, his silence when he should speak or his failure to disclose what he ought to dis-

close constitutes fraud in law just as do actual affirmative false representations." *Tigner v. Shearson–Lehman Hutton, Inc.,* 201 Ga.App. 713, 411 S.E.2d 800, 802 (1991) (citations omitted). O.C.G.A. § 23–2–58 defines a confidential relationship as one "where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another." In *Tigner,* the court held there was a confidential relationship when a broker undertook an obligation to manage the plaintiff's financial investments. However, in *Stewart v. Boykin,* the Georgia Court of Appeals held that where an insurance agent was not the employee of the insurance company, the existence of a fiduciary relationship between the agent and the insured was a question for the jury. *Stewart v. Boykin,* 165 Ga.App. 868, 303 S.E.2d 50 (1983). *See also Dominick,* 809 F.2d at 1570–71(duty of fair dealing and to disclose material facts where insured in inferior bargaining position to agent). Based on this guidance, the issue of whether there was a duty to disclose the true nature of the policy to Defendants is more appropriately a question for the jury.

## 2. Affirmance v. Rescission

When a party seeks to prove he was fraudulently induced by misrepresentations into entering a contract, "he can affirm the contract and sue for breach or seek to rescind and sue in tort for fraud and deceit." *Carpenter v. Curtis,* 196 Ga. App. 234, 395 S.E.2d 653, 655 (1990) (citations omitted). "Affirmance of the contract by the defrauded party does not necessarily deprive him of the right to sue for damages for fraud, as the right to affirm and the right to fraud damages coexist. However, he must do nothing to waive the fraud." *Id.* Waiver may be accomplished by actually affirming the contract, by waiting too long to bring an action on the contract and thus constructively affirming the contract or in some instances by a

merger clause that is not itself voidable because of fraud. *See generally Id.* A merger clause can be defeated under certain circumstances such as where there is evidence the transaction in question was not an arm's length transaction between professionals or there was a duty to disclose between the parties. *Kobatake v. E.I. DuPont De Nemours and Co. et al.,* 162 F.3d 619, 626 (11th Cir.1998) (citation omitted). If rescission of the contract is no longer a viable option, a plaintiff must proceed under the contract and seek any damages to which he is entitled. *Carpenter,* 395 S.E.2d at 656.

One case specifically addressing insurance policies stated "courts should be concerned with assuring that the insurance purchasing public's reasonable expectations are fulfilled." *Benevento v. Life USA Holding, Inc.,* 61 F.Supp.2d 407, 418 (E.D.Penn.1999)(annuity case where insureds claimed fraud in the sale of the policy). "Regardless of the ambiguity (or lack thereof) inherent in a given set of insurance documents (whether they be applications, conditional receipts, rider, policies, etc.), the public has a right to expect that they will receive something of comparable value in return for the premium paid." *Id.* (citations omitted). "Thus, where an individual applies and pays for specific insurance coverage, the insurer may not unilaterally change the coverage or issue a policy differing from what the insured requested and paid for without affirmatively showing that the insured was notified or, and understood the change, regardless of whether the insured read the policy." *Id.* (citation omitted). *See also Greenberg v. Life Insurance Company of Virginia,* 177 F.3d 507 (6th Cir.1999)(interpreting a similar contract pursuant to similar Ohio law and finding the contract sufficiently ambiguous, vague and misleading to reverse trial court's dismissal for failure to state a claim).

■ The most pertinent statement of Georgia law is that: "Concealment of material facts may amount to fraud when direct inquiry is made, and the truth evaded, or where the concealment is of intrinsic qualities of the articles which the other party by the exercise of ordinary prudence and caution could not discover." *Rivers v. BMW of North America, Inc.,* 214 Ga.App. 880, 449 S.E.2d 337 (1994).[4] This statement of the law is taken from a jury instruction in fraud cases involving vehicles sold to consumers who were misled into purchasing a product that was not as represented by the seller. This principle is also applicable where insureds have been fraudulently induced into parting with thousands of dollars to purchase a life insurance policy that was materially different from what was represented by the company. Based on this precedent, Defendants are not estopped from asserting both fraud and breach of contract in their Counterclaim.

### 3. Parol Evidence Rule and Related Issues

■ In support of the Donaldsons' claim that Mr. Donaldson was fraudulently induced into signing and maintaining the policy in question, they filed various documents, affidavits and briefs containing information that GE contends violates the Parol Evidence Rule. As a matter of general contract construction, a contract containing a "merger" clause indicates a complete agreement between the parties that may not be contradicted by extraneous material. However, in the case of fraud, extraneous material may sometimes be admitted. "False and fraudulent representations as to an existing fact which induced

the signing of a sales contract give the purchaser the right to rescind the contract." *Crews v. Cisco Bros. Ford–Mercury, Inc.,* 201 Ga.App. 589, 411 S.E.2d 518, 519 (1991) (citations omitted)(concerned buyers of used vehicles sued dealer for fraud after learning the vehicles had been previously wrecked). "One who seeks rescission of a contract for fraud must restore or offer to restore the consideration received thereunder, as a condition precedent to bringing the action." *Id.* (citation omitted). "[H]owever, restoration by the purchaser is not an absolute rule, and does not require that the defrauding part be placed in exact status quo, but only that he be placed substantially in his original position and that the party rescinding derives no unconscionable advantage from the rescission." *Id.* (citations omitted). The defrauded party need not offer to restore where the defrauding party has made restoration impossible or when to do so would be unreasonable. *Id.* (citations omitted). This rule can only be applied when it is equitable. *Id.* at 520. It "was not meant to give the defrauding party an advantage at the expense of the defrauded purchaser." *Id.*

■ With this general guidance in mind, the analysis can proceed to the underlying issues. As to the merger clause, "questions of reliance on the alleged fraudulent misrepresentation in tort cases cannot be determined by the provisions of the contract sought to be rescinded but must be determined as a question of fact for the jury." *Id.* (citing *City Dodge v. Gardner,* 232 Ga. 766, 208 S.E.2d 794 (1974)). It is inconsistent "to apply a disclaimer provision of a contract in a tort action brought

---

4. The Court notes that *Life Ins. Co. of Virginia v. Conley* relied upon by GE does not appear to be the current state of the law in Georgia regarding fraudulent inducement to purchase a life insurance contract. *Life Ins. Co. of Virginia v. Conley,* 181 Ga.App. 152, 351 S.E.2d 498 (1986). Although *Conley* interpreted a similar contract with GE, subsequent case law indicates a different approach than the one taken in *Conley* that would result in a complete miscarriage of justice to the insured.

to determine whether the entire contract is invalid because of alleged prior fraud which induced the execution of the contract." *Id.* "If the contract is invalid because of the antecedent fraud, then the disclaimer provision therein is ineffectual since, in legal contemplation, there is no contract between the parties." *Id.* at 520–21 (citation omitted). "Parol evidence showing fraud in the inducement is admissible even though the written contract says the entire agreement of the parties is contained therein." *del Mazo v. Sanchez*, 186 Ga.App. 120, 366 S.E.2d 333, 337 (1988). Evidence of fraudulent inducement is sufficient to raise an issue thereby precluding summary judgment on the issue of fraud. *Id.* "Questions of fraud, the truth and materiality of representations made by a seller, and whether the buyer could have protected himself by the exercise of proper diligence are, except in plain and indisputable cases, questions for the jury." *Id.* (citations omitted).

The Donaldsons assert claims for fraud and concealment based on an insurance policy. They contend Mr. Donaldson's policy omitted material information the lack of which was the direct and proximate cause of their damages. The Donaldsons contend there were misrepresentations regarding the duration of coverage, the type of coverage, the duration and type of premiums and other important information vital to a complete understanding of the policy.

The policy provided for an interest rate of 7.4%. The maturity date of the policy was stated as 2037 or 51 years after the inception date. Although it is extremely vague, ambiguous and misleading, the pertinent clauses in the policy provided that the quarterly premium would remain the same as long as the cash value did not diminish. The cash value would apparently diminish if interest rates dropped but this was not disclosed in the policy. Bruce

Booker testified that GE's calculation in determining the policy's initial premium was based on interest rates remaining the same for 20–30 years. It is preposterous to assume that interest rates would remain constant or anywhere near the same ballpark for four or five decades. However, this is not made clear anywhere in the policy. It is absurd to expect the Donaldsons to have understood the ramifications of the financial market on their insurance policy. Indeed, the policy language contains no clear language indicating GE's right to increase the initial, agreed-upon premium. Further, the policy does not contain any sort of clear explanation of the circumstances under which the premiums would increase or decrease, of what the true meaning of cash value is in relation to the continuation of the policy or of how insureds could avoid the lapse of their policy. There are places where terms of art are defined or where a number is stated such as the then-current interest rate or *illustrative* interest rates. These terms or phrases are not explained though in relation to how these concepts affect the policy.

The Policy Data Sheet provided for a "scheduled premium" that was due quarterly. Although the policy is named "Flexible Premium Adjustable Life Insurance" policy, nowhere is "flexible" explained. The only place "flexible" is mentioned is where it is noted the *insured* can change the *frequency* or the *amount* of the premiums. In another section, the policy states it is *possible* coverage will expire "where either no premiums are paid following payment of the insured premium or subsequent premiums are insufficient to continue coverage to such date." This could easily be construed to mean that coverage will only lapse if the quarterly payment is not made since this language is located after the "scheduled" premium.

In another section of the policy titled "Continuation of Coverage," it provides if the premiums are not made "as planned" the coverage will lapse unless "cash value less policy debt covers the monthly deduction." Again, this concept is not explained. This vague, confusing statement is all that purports to explain when and/or how coverage could lapse. Over all, the policy is profoundly vague. Under the summary judgment standards this Court must apply, Defendants Bobby and Mildred Donaldson have far exceeded their burden to establish material issues of fact precluding judgment for GE.

Contrary to GE's argument, waiver or estoppel do not apply to bar Defendants' claims. It is clear the Defendants did not ratify or affirm the contract in question *with knowledge of the fraud* thereby showing their intention to abide by the contract. *Touche, Inc. v. Dearborn,* 161 Ga.App. 188, 291 S.E.2d 35, 38 (1982). Further, they did not waive the cause of action for fraud. The "question as to whether the defrauded party has waived the fraud is one mainly of intent." *Id.* The issue of intent is a question more appropriately submitted to a jury and not adjudicated on summary judgment.

 Likewise, GE's argument that Mr. Donaldson should rescind the policy and return any benefit obtained therefrom is equally without merit. First, neither Mr. nor Mrs. Donaldson have realized any monetary benefit from this policy as Mr. Donaldson is still alive. Second, it would be extremely inequitable and unreasonable at this point to require Mr. Donaldson to rescind the policy and buy a new policy. Nearly 20 years have passed since they purchased this policy. In that time, Mr. Donaldson has aged and his health has deteriorated considerably. He now has a serious heart condition and is in need of a transplant. As a result, he is virtually uninsurable for coverage such as that he sought through GE in 1986. Because Defendants Bobby and Mildred Donaldson have submitted sufficient evidence to create material issues of fact in dispute, **Summary Judgment** is **denied** as to the Fraud and Concealment claims.

### C. Georgia RICO Claims

Because the issue of whether GE committed fraud must be submitted to a jury, there is no basis upon which to decide the RICO claims. RICO claims cannot be adjudicated without a finding of fraud that could serve as a predicate act under Georgia RICO laws. *See Prince Heaton Enters., Inc. v. Buffalo's Franchise Concepts, Inc.,* 117 F.Supp.2d 1357, 1362 (N.D.Ga. 2000). Accordingly, **Summary Judgment** is **denied** as to the RICO claims.

### VI. Conclusion

For these reasons, Plaintiff's Motion for Summary Judgment on Defendants' Counterclaim is DENIED. Defendants' Motion for Summary Judgment is DENIED as to their claim attacking this Court's jurisdiction to consider the Declaratory Judgment action and MOOT to the extent it has already been adjudicated in the Order denying the joinder of Ralph Smith.